Quin **MORTON**, Executor of the Estate of D. Holmes Morton, deceased, Plaintiff,

v.

The **UNITED STATES** of America, Defendant.

Civ. A. No. 3605.

United States District Court, S. D. West Virginia, Charleston Division.

Feb. 3, 1971.

Thomas N. Chambers, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., for plaintiff.

Johnnie M. Walters, H. E. Marmoll, Dept. of Justice, Washington, D. C., and W. Warren Upton, U. S. Atty., Charleston, W. Va., for defendant.

## MEMORANDUM OPINION

FIELD, Chief Judge.

This is an action under 28 U.S.C. Section 1346 for the recovery of federal estate taxes and interest allegedly overpaid by the plaintiff amounting in the aggregate to $48,188.74. Briefly stated, the issue to be determined is whether the value of a certain life insurance policy on the life of D. Holmes Morton (hereinafter referred to as the decedent) is includable in the decedent's estate for estate tax purposes.

The decedent died testate a resident of Charleston, West Virginia, on August 17, 1963. The plaintiff herein, Quin Morton, is the son of the decedent and is presently serving as executor of his father's estate, initially having been appointed as co-executor of such estate on August 20, 1963, by the County Court of Kanawha County, West Virginia.

A federal estate tax return was filed with the Internal Revenue Service on October 19, 1964. The estate tax liability shown thereon to be due in the amount of $37,570.21 was paid upon the filing of the return. The value of Northwestern Mutual Life Insurance Policy No. 2414879 (Northwestern Policy), in the face amount of $200,000.00, insuring the life of the decedent, was not included in the gross estate. Upon audit of the estate tax return, the Internal Revenue Service determined tax deficiencies to exist, which deficiencies were paid with interest on or about the dates set forth below:

| Date | Estate Tax Deficiency | Interest | Total |
|---|---|---|---|
| January 26, 1966 | $14,381.01 | $1,000.95 | $15,381.96 |
| April 11, 1966 | 44,443.32 | 3,745.42 | 48,188.74 |
| | | | $63,750.70 |

The major portion of the assessed deficiencies is represented by the inclusion in the estate of the proceeds from the aforementioned Northwestern Policy having a value of $208,121.00.

On October 28, 1966, plaintiff filed a claim for refund of federal estate taxes and interest alleged to have been erroneously and illegally collected in the amount of $46,980.24, plus interest. By

notice dated December 27, 1966 the Internal Revenue Service District Director allowed the claim to the extent of $199.08 and disallowed the claim to the extent of $46,781.16. In the notice the District Director allowed the claim for deduction of additional attorney's fees and expenses of $9,191.72, but offset the tax refund resulting therefrom, except to the extent of $199.08, by a reduction in the credit for state death taxes paid from $7,766.06 to $5,023.79. The plaintiff's claim for the exclusion from the estate of the proceeds of the Northwestern Policy in the amount of $208,121.00 was denied. Thereupon, the plaintiff, on March 10, 1967, filed this action for recovery of the tax deficiency and interest.

Decedent was the husband of Boydie Cox Morton whose sister, Margaret Cox Jones, was the wife of Claud A. Jones. Mrs. Morton and Mrs. Jones were daughters of Frank Cox. Mr. Cox was interested in providing a measure of financial security for his two daughters and his grandchildren, and to that end he made arrangements for a policy of life insurance to be issued upon each of his sons-in-law. Each of the policies was issued by Northwestern Mutual Life Insurance Company pursuant to applications signed by Morton and Jones. Policy No. 2414246 which insured the life of Claud A. Jones in the face amount of $200,000.00 was issued on May 26, 1932, and the Morton policy hereinbefore described was issued on May 28, 1932. Premium notices were to be sent to Frank Cox and the applications provided that cash dividends should be applied towards reduction of premiums until otherwise directed. The applications further directed that the Automatic Premium Loan provision of each policy should become operative in accordance with its terms. Prior to his death on November 14, 1934, Mr. Cox paid the annual premiums on these policies for the years 1932, 1933 and 1934.

Under both policies the proceeds were initially payable to the executors, administrators or assigns of the respective insureds. Within two months after the issuance of the policies, supplemental designations were executed by Morton and Jones, respectively, revoking the original beneficiary designation and designating the wife, children, sister-in-law, nieces and nephew of each insured as primary beneficiaries, and any children of the insured's children or nieces or nephew were designated as secondary beneficiaries. The supplemental designation was executed by Morton on June 26, 1932 and was made a part of the policy on his life by endorsement dated July 8, 1932. The supplemental designation on the Jones policy was executed by Jones on June 30, 1932 and made a part of the policy on his life by endorsement dated July 15, 1932. These endorsements provided that in the event all the designated beneficiaries predeceased the insured, then in such event, Frank Cox or his executor, administrator or assigns would receive the proceeds of the policy. Each endorsement further provided:

"IN CONSIDERATION OF THE PAYMENT of premiums on said policy by Frank Cox, the power to exercise all the rights and privileges specified in and/or conferred upon the insured by the terms of said policy, including the right to change or revoke the foregoing, shall be vested solely in said Frank Cox during his life time (but not in his executors or administrators) except that no one shall be designated as beneficiary or contingent beneficiary without the consent of either the insured or said Insurance Company."

Each of these supplemental designations were signed by Morton and Jones as the insureds and, additionally, were signed by Frank Cox to indicate his acceptance of the terms and conditions of the supplemental designations.

Upon the death of Mr. Cox in 1934, his residual estate became vested in equal shares in Boydie Cox Morton and Margaret Cox Jones. The bulk of the assets of the estate were held by the Cox Corporation, and this corporation paid the premiums on these two policies for

the years 1935 through 1937, charging the payments to the accounts of the two individual stockholders, Mrs. Morton and Mrs. Jones. The Corporation was dissolved in November of 1937 and the assets distributed to those two stockholders.

Subsequent to the death of Frank Cox endorsements were effected on the Jones and Morton policies eliminating Cox, his executors, administrators or assigns as contingent beneficiaries. The endorsement on the Morton policy was dated January 17, 1938 and reads as follows:

"Whereas Frank Cox, father-in-law of the insured is deceased, the provisions of the third paragraph of the supplement, dated June 26, 1932, are revoked and the insured has directed that in event no beneficiary or contingent beneficiary survives the insured, payment shall be made, when due, to the executors, administrators or assigns of the insured.

"The right to change or revoke the foregoing is reserved to the insured."

Shortly thereafter, it was decided that it would be advisable to eliminate the cross-family beneficiary designations in the Jones and Morton policies. Accordingly, a supplement dated April 4, 1938 was executed by D. Holmes Morton with respect to Policy No. 2414879, and this supplement was properly incorporated as a part of the policy by endorsement dated April 7, 1938. By this endorsement Boydie Cox Morton, Quin, Emma Lou and Margaret Morton, wife and children of the insured, were named as primary beneficiaries and any surviving spouse or children of the latter were named as contingent beneficiaries. In this supplemental designation, Morton also designated the manner or method in which payment of the proceeds of the policy should be made. Immediately following the language in this supplemental endorsement designating the primary and contingent beneficiaries and directing the method for the payment of the policy proceeds, the following statement appears: "I HEREBY WAIVE the right

to change or revoke the foregoing." The supplemental endorsement also specifically revoked the prior designation of beneficiaries and option settlement which had appeared in prior endorsements. Except for the names of individuals, an identical endorsement was placed on Jones' policy under date of March 25, 1938.

Following the dissolution of the Cox Corporation, the annual premiums on the Morton policy were paid by Boydie Cox Morton commencing with the premium due in May of 1938 and continuing up until the death of the insured in 1963. Similarly, Margaret Cox Jones paid the premiums on the Jones policy from 1938 until the death of Claud A. Jones in August of 1948. The premiums paid on the Morton policy from the date of issuance until Morton's death totalled $220,472.00 net after dividends applied. The premiums paid from the funds of Boydie Cox Morton were drawn on a special account in her name maintained at The Kanawha Valley Bank. This account was used to cover Mrs. Morton's business and investment income and expenses.

Over the years, D. Holmes Morton kept his financial affairs separate and apart from those of his wife and family in a most scrupulous and meticulous manner. He maintained his own personal checking account and a separate ledger book covering his financial affairs. The special account of Boydie Cox Morton was covered by a journal book and ledger sheets which recorded all transactions involving that account and reveal that the source of funds to this account was from Mrs. Morton's separate assets and investments. The insured never paid a premium on the Northwestern Policy out of his own funds, and the policy was never considered or included as an asset of Mr. Morton in computing his own net worth.

At the time of Morton's death, the Northwestern Policy was located in a leather folder in an office safe of Briar Mountain Coal and Coke Company which was a corporation owned by Boydie Cox

Morton, Margaret Cox Jones and their descendants. During the period from 1938 to 1963, nine children were born to the decedent's children Quin, Emma Lou and Margaret, and all these grandchildren were living at the time of Morton's death. Under the provisions of the supplemental endorsement of April 7, 1938, these nine grandchildren of the decedent were contingent beneficiaries under the policy. The foregoing factual recitals are based upon the stipulation of counsel and the exhibits attached thereto as well as the evidence presented in open court, and do not appear to be controverted by the Government.

The Northwestern Policy here in question by its terms provided, in effect, as follows: [1]

1. *Assignments.* No assignment of the policy would be binding upon the Company until filed at its home office, and the Company assumed no responsibility as to the validity or effect of any assignment. (Par. 10.)

2. *Premium loans.* The insured and assignees, if any, could request the insurer for a premium loan provided the request was made prior to default and the cash surrender value was sufficient to cover the premium then due. (Par. 12(b).)

3. *Cash surrender value.* Upon receipt of the policy and a full and valid surrender of all claims thereunder, and "without the consent or participation of any Beneficiary not irrevocably designated or any Contingent Beneficiary" the Company would pay the cash surrender value of the policy. (Par. 12(e).)

4. *Policy loans.* At any time after premiums for two full years had been paid and while the policy was in force except as extended-term insurance, without the consent or participation of any beneficiary not irrevocably designated or any contingent beneficiary, a policy loan could be obtained by properly assigning the policy and forwarding it to the Company at its home office. The amount of the policy loans was limited to the amount secured by the cash surrender value of the policy. (Par. 12(f).)

5. *Dividend options.* At the option of the insured, dividends could be (a) withdrawn in cash; (b) applied toward the payment of premiums; (c) applied toward the purchase of a participating paid-up addition to the policy; (d) left to accumulate with interest. Dividends were subject to withdrawal in cash at any time or could be paid with the proceeds of the policy. (Par. 9.)

6. *Endowment option.* Whenever the reserve on the policy at the end of a policy year, together with the reserve on the existing dividend additions, should be equal to or in excess of the face amount of the policy, the insured could upon surrender of the policy, as well as a full and valid surrender of all claims thereunder, without consent or participation of any beneficiary not irrevocably designated or any contingent beneficiary, obtain the face amount of the policy. (Par. 9(b).)

7. *Full paid participating insurance.* The insured could obtain full paid participating insurance provided certain specified conditions were met. (Par. 12(d).)

8. *Paid-up insurance.* The insured and assigns, if any, upon written request to the Company, could obtain participating paid-up life insurance instead of automatic extended-term insurance, if such request was made prior to default in premium payment or within the grace period. (Par. 9(a).)

9. *Beneficiaries.* The insured could (1) designate one or more beneficiaries either with or without reservation of the right to revoke such designation; (2) designate one or more contingent beneficiaries; (3) change any beneficiary not irrevocably designated; and (4) change any contingent beneficiary. (Par. 11.)

10. *Method of payment.* The insured could designate the method by which the

---

I. The numbers of the several paragraphs of the General Provisions of the policy are designated in parentheses.

proceeds of the policy would be paid to the beneficiaries. (P. 5, par. 1.)

11. *Reinstatement.* The insured could have the policy reinstated at any time within five years after default in payment of premiums by paying all premium arrears, with interest, and any indebtedness which might exist, with interest, upon evidence satisfactory to the Company of his insurability. (Par. 8.)

The question, of course, is whether on those facts the proceeds of the Northwestern Policy No. 2414879 are properly includable as a part of Morton's gross estate under Section 2042 of the Internal Revenue Code of 1954. This statute provides in pertinent part as follows:

" § 2042. Proceeds of life insurance

The value of the gross estate shall include the value of all property—

\* \* \* \* \* \*

(2) Receivable by other beneficiaries.—To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. \* \* \* "

"Incidents of ownership" are not defined by the statute, but Treasury Regulation Sec. 20.2042–1(c) (2) states, *inter alia*:

"For purposes of this paragraph, the term 'incidents of ownership' is not limited in its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has reference to the right of the insured or his estate to the economic benefits of the policy. \* \* \* "

The Government concedes that the endorsement of April 7, 1938, divested the insured, Morton, of the policy rights hereinabove designated as items 9 and 10, and that thereafter he possessed no power to change the primary or contingent beneficiaries nor to change the method of payment of the *policy* proceeds as set forth in the supplemental designation.

Despite this divestiture by Morton of these rights, however, the Government contends that Morton possessed "incidents of ownership" in the policy at the time of his death which require the inclusion of the policy proceeds in his gross estate for estate tax purposes. Understandably, the Government places primary reliance upon the Supreme Court's decision in Commissioner of Internal Revenue v. Noel, 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965), for the proposition that the so-called "policy facts" are, as stated in the Government's brief, "impregnable to attack from the 'intent facts,' those which relate to the conduct and understanding of the insured and the other parties who paid the premiums and were primary beneficiaries of the policy."

Whether the *Noel* decision requires that the "policy facts" be accorded what, in effect, amounts to conclusive control in a case such as this is not so crystal clear as the Government suggests. The factual situation under consideration in *Noel* was unique and somewhat suspect. The case involved accident insurance covering an airplane flight which resulted in the death of the insured. The flight insurance policies were in normal form and the Tax Court found that all incidents of ownership were in the insured and included the same in his estate. The Court of Appeals reversed, holding that accident insurance was not "life insurance" within the meaning of the statute and, hence, was not taxable. Holding accident insurance to be subject to tax as life insurance, the Supreme Court proceeded to pass upon the estate's alternative defenses, namely that decedent did not possess any incidents of ownership in the policies at the time of his death. Three points were advanced. First, it was argued that the beneficiary (decedent's wife) paid the $5.00 premium for the policies and therefore owned them; secondly, the insured orally assigned the policies to the beneficiary, and finally, assuming that decedent had contractual power to assign or to make a beneficiary change, this

power was illusory since he could not have exercised that power in the interval between take-off and the fatal crash.

Accepting her claim to have made the purchase, the Court viewed the transaction as a purchase of a contract which granted to the insured the right to exercise the incidents of ownership. As to the claimed oral gift or assignment, the Court pointed out that the contract terms provided that the policies could not be assigned or beneficiary changed without a written endorsement, hence, the power to assign or change was still in the insured.

As to the third point, the Court said (380 U.S. at 684, 85 S.Ct. at 1241):

"We hold that estate tax liability for policies 'with respect to which the decedent possessed at his death any of the incidents of ownership' depends on a general, legal power to exercise ownership, without regard to the owner's ability to exercise it at a particular moment."

It is clear that the Tax Court entertained some doubts relative to Mrs. Noel's testimony concerning the purchase and "assignment" of the policies and declined to make a finding thereon. On this point, the following statement from the Tax Court's opinion is of more than passing interest (39 T.C. at 471–472):

" 'To be sure, we heard testimony that she paid the premiums, but we were not entirely convinced, and since taxability under the 1954 Code does not depend upon who paid the premiums, we have not made any finding one way or the other as to this matter. To establish an assignment, the decedent's wife testified that the decedent told the clerk at the airport to give the policies to her, that they "now belonged" to her, and that "he had nothing more to do with them." We think that the delivery of the policies to her in such circumstances hardly establishes an assignment. It must be recalled that the policies contained provisions for insurance in re-spect of various bodily injuries short of death, and in such circumstances we are not convinced that petitioner intended to part with all rights in the policies. Rather, the testimony, even if strictly accurate, suggests merely that the decedent was indulging in a common practice of giving physical possession of the policies to the beneficiary so that, in the event of a fatal accident, she would be in a position to assert her rights under the policies. We do not find that by these oral statements, the decedent intended to make any irrevocable disposition of all his rights under the policies, even assuming that he could legally do so in that manner.' "

The Government also relies on the following cases which have applied the *Noel* rationale. Piggott's Estate v. C. I. R., 340 F.2d 829 (6th Cir. 1969); United States v. Rhode Island Hospital Trust Co., 355 F.2d 7 (1st Cir. 1966); Kearns v. United States, 399 F.2d 226, 185 Ct. Cl. 227 (1968); and Cockrill et al. v. O'Hara, District Director, 302 F.Supp. 1365 (M.D.Tenn.1969).

A careful reading of these cases indicates that they have at least two elements in common. First, in every case the taxpayer was forced to rely solely on the extrinsic facts to carry the day for there was nothing in the policies, by endorsement or otherwise, to negative substantial incidents of ownership in the insured. Second, and of more significance, *in every case the insured had retained the right to change the beneficiary.* This right to change the beneficiary is a pivotal incident both in law and in fact. Many of the policy rights may be freely exercised by the insured alone if the beneficiary has not been irrevocably designated. Once such an irrevocable designation has been made, however, the powers and "incidents of ownership" of the insured with respect to the policy are severely limited by both the policy provisions and general law. The irrevocably designated beneficiary has an absolute, vested interest in the policy of which he cannot be divested

without his consent, and this principle applies even to a policy to which there are attached the incidents of a loan value or cash surrender value. See 44 Am. Jur.2d Insurance § 1737; 3A Appleman, Insurance Law and Practice § 1754.

The evidence in the present case clearly demonstrates that Morton never exercised any incidents of ownership over the policy in question and had no intention of doing so. But assuming he had tried to exercise any such incidents or rights, it is extremely doubtful that his wife and children, as irrevocably designated beneficiaries, would have jeopardized their vested financial interests in the policy by consenting thereto.

The Government would contend, of course, that in such event, even though the positions of the insured and the beneficiaries were financially adverse in fact, nevertheless the latter *could* have acted "in conjunction with" Morton in exercising the incidents of ownership and this is sufficient to bring the policy proceeds within the reach of Section 2042(2) of the Code. But there is more here and it all militates against the position of the Government.

As heretofore pointed out, the endorsement of April 7, 1938, irrevocably designated Morton's wife and children as primary beneficiaries of the policy, and, additionally, it designated his grandchildren as contingent beneficiaries. These contingent or secondary beneficiaries, born and unborn, had vested interests in the policy which the insurer was bound to respect, and any attempt by Morton to exercise policy rights which would have adversely affected these secondary beneficiaries would not have been recognized by Northwestern. The only possible manner in which the rights of these contingent beneficiaries might have been terminated or altered would have been through an adversary proceeding in a Circuit Court in the State of West Virginia; and it is inconceivable that any guardian *ad litem* in such a proceeding would have recommended any action detrimental to the financial interests of the

infant and unborn members of this class. It is equally inconceivable that in such a case the Court would enter any decree adverse to the interests of these infants.

The realistic impact of these legal limitations on Morton's "incidents of ownership" is recognized in Treasury Reg. § 20.2042-1(c) (5) which reads in part: "As an additional step in determining whether or not a decedent possessed any incidents of ownership in a policy or any part of a policy, regard must be given to the effect of the State or other applicable law upon the terms of the policy." It is clear that the application of well-recognized principles of insurance law would in this case have prevented Morton from exercising any rights under the policy which specifically required the consent of any irrevocably designated beneficiary. This would eliminate the decedent's rights under the policy to obtain the cash surrender value; obtain a policy loan; or exercise the Endowment option.

In addition to the elimination of these three policy rights hereinbefore designated as items 3, 4 and 6, the Government, of necessity, has conceded that Morton had divested himself of the rights designated as items 9 and 10. Item 5, the Dividend option, was also, in fact, a nonexistent incident since at the time of the issuance of the policy the insurer was directed to apply such dividends toward the payment of premiums under option (b), and they were so applied throughout the life of the insured with the result that at no time were there any accumulated dividends on the policy.

Items 2, 7, 8 and 11 relative to premium loans, full paid participating insurance, paid-up insurance and reinstatement assuredly could not be characterized as incidents of ownership in the decedent. Treasury Reg. § 20.2042–1(c) (2) states: "For purposes of this paragraph, the term 'incidents of ownership' is not limited in its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has

reference to the right of the insured or his estate to the economic benefits of the policy." These items represented no economic benefit to the insured or his estate, but would have been invoked or exercised only in the event it became necessary under appropriate circumstances in order to protect the beneficiaries and secure to them the proceeds of the policy upon Morton's life.

The only remaining provision to be considered is item 1 relative to assignment of the policy. This provision is couched in negative terms to the effect that any assignment would not be binding upon the insurer until filed at its home office, and the Company specifically disclaimed any responsibility as to the validity or effect of any assignment. Again the application of recognized legal principles to the facts of this case clearly eliminates this as an incident of ownership in Morton. This conclusion is inescapable upon the same basis and in the light of the observations hereinbefore made with respect to the policy provisions relative to cash surrender value, policy loans and the Endowment option. See also Waller v. Waller, 341 Ill.App. 204, 93 N.E.2d 113 (1950).

The Government contends that the 1954 Revenue Code amendments relative to life insurance effected a major legislative change which "evoked a change in the court decisions interpreting Section 2042," but I find no support for this statement in the legislative history, the Treasury Regulations, or any of the decisions, including the *Noel* case. The issue in a case such as this is a factual one and this was not basically changed by the 1954 amendment. In United States v. Rhode Island Hospital Trust Co., *supra*, the Court defined the issue in such a case, stating, "It is undoubtedly true that the question of possession of incidents of ownership of a life insurance policy is one of fact, the plaintiff having the burden of proving non-possession of all."

In the present case when the "policy facts," including the irrevocable designation of the primary and secondary beneficiaries, are appraised in the light of the "intent facts" and the application of state and general law thereto, the totality of the evidence clearly preponderates in favor of the plaintiff; and supports the ultimate finding of fact and conclusion of law that the decedent, D. Holmes Morton, at the time of his death did not own nor possess any of the incidents of ownership in Northwestern Mutual Life Insurance Company Policy No. 2414879 sufficient to require inclusion of the value of this policy in his gross estate for federal estate tax purposes.

Judgment should be entered in favor of the plaintiff and counsel may prepare an appropriate order incorporating this opinion by reference therein.